Slip Op. 12-156

UNITED STATES COURT OF INTERNATIONAL TRADE

MUELLER COMERCIAL DE MEXICO, S. DE R.L. DE C.V., and SOUTHLAND PIPE NIPPLES CO, INC.,

                              Plaintiffs,

              v.

UNITED STATES,

                              Defendant.

Before: Leo M. Gordon, Judge

Court No. 11-00319

**PUBLIC VERSION**

**OPINION and ORDER**

[Plaintiffs' motion for judgment on the agency record denied; final administrative review results sustained.]

Dated: December 21, 2012

David E. Bond, Yohai Baisburd, Jay C. Campbell, and Ting-Ting Kao, White & Case LLP of Washington, DC, for Plaintiffs Mueller Comercial de Mexico, S. de R.L. de C.V. and Southland Pipe Nipples Co., Inc.

Douglas G. Edelschick, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Plaintiff United States. With him on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director.  Of counsel was Nathaniel J. Havlorson, Department of Commerce, Office of the Chief Counsel for Import Administration.

Roger B. Schagrin and Michael J. Brown, Schagrin Associates of Washington, DC, for Defendant-Intervenors TMK IPSCO Tubulars and Allied Tube and Conduit.

Jeffrey D. Gerrish and Robert E. Lighthizer, Skadden Arps Slate Meagher & Flom, LLP of Washington, DC, for Defendant-Intervenor United States Steel Corporation.

Gordon, Judge: This action involves an administrative review conducted by the

U.S. Department of Commerce ("Commerce") of the antidumping duty order covering

certain circular welded non-alloy steel pipe from Mexico.  See  Certain Circular Welded Non-Alloy Steel Pipe From Mexico, 76 Fed. Reg. 36,086 (Dep't of Commerce June 21, 2011) (admin. review 2008-09 final results) (Final Results); see also Issues and Decision Memorandum for Final Results of Antidumping Duty Administrative Review: Certain Circular Welded Non-Alloy Steel Pipe from Mexico, A-201-805 (June 13, 2011), available at http://ia.ita.doc.gov/frn/summary/mexico/2011-15461-1.pdf (Decision Memorandum), which incorporates by reference the Use of Adverse Facts Available (AFA) for Final Results Memorandum (June 13, 2011) (AFA Memo), CD 66[1] (last visited Dec. 21, 2012.)

Before the court is the motion for judgment on the agency record of Plaintiffs Mueller Comercial de Mexico, S. de R.L. de C.V., and Southland Pipe Nipples Company, Inc. (collectively Mueller).  The court previously stayed Mueller's challenge to Commerce's use of zeroing pending a decision on that issue from the Federal Circuit.  See Order, Nov. 21, 2011, ECF No. 35.  This opinion addresses Mueller's remaining challenge to Commerce's use of facts available for missing production data from a non-cooperating mandatory respondent that supplied Mueller.  The court has jurisdiction pursuant to Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[2] and 28 U.S.C. § 1581(c) (2006).  For the reasons set forth below, the court sustains Commerce's use of facts available.

---

[1] "CD __" refers to Confidential Document.

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

## I. Standard of Review

For administrative reviews of antidumping duty orders, the U.S. Court of International Trade sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review.  3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d. ed. 2012).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."  Edward D. Re, Bernard J. Babb, and Susan M. Koplin, 8 West's Fed. Forms, National Courts § 13342 (2d ed. 2012).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute.  See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Background

At the start of the administrative review, Commerce selected three mandatory respondents, (1) Mueller, an exporter, who sourced subject merchandise from producers, (2) Tuberia Nacional, S.A. de C.V. ("TUNA"), and (3) Ternium Mexico, S.A. de C.V. ("Ternium").   Certain Circular Welded Non-Alloy Steel Pipe from Mexico, 75 Fed. Reg. 78,216 at 78,216, (Dep't of Commerce Dec. 15, 2010) (admin. review 2008-09 prelim. results) ("Preliminary Results").  Mueller fully cooperated.  As a reseller, though, Mueller did not possess all of the cost information Commerce required to calculate Mueller's margin. Decision Memorandum at 13.  Commerce requested the cost information directly from Mueller's two principal unaffiliated suppliers (and the two other mandatory respondents), TUNA and Ternium. Preliminary Results at 78,219-20; see also SKF USA Inc. v. United States, 630 F.3d 1365, 1371, 1375-76 (Fed. Cir. 2011) ("SKF") ("On the face of these provisions, Commerce can utilize unaffiliated suppliers' records for cost of production data in lieu of the exporter's acquisition cost."), on remand to, SKF USA Inc. v. United States, 35 CIT ___, 2011 WL 4889070 (Oct. 14, 2011), opinion after remand, SKF USA Inc. v. United States, 36 CIT ___, 2012 WL

2929404 (July 18, 2012).   Although TUNA's review was rescinded (due to no direct shipments), and Ternium opted not to participate in its own margin calculation, TUNA and Ternium did respond separately to Commerce's request for cost of production (COP) data for sales made to Mueller. Commerce sought this information to evaluate (1) whether Mueller's home market sales were made below the cost of production, and (2) to calculate a constructed value for comparison to Mueller's United States prices when a price-to-price comparison was not possible. Preliminary Results at 78,219-20; see also 19 U.S.C. § 1677b(b)(3); 19 U.S.C. § 1677b(e).

TUNA fully cooperated with these COP data requests, reporting cost of production on a product-specific basis.  Ternium, however, did not cooperate to the same extent. Ternium failed to "'provide detailed product-specific calculations that allocate costs based on product dimensions.'"  AFA Memo at 2 (quoting Ternium's December 21, 2010, section D questionnaire response at 3).  After determining Ternium had not cooperated to the best of its ability, Commerce applied adverse facts available (AFA) for Ternium's "cost of production for the specific products sold by Ternium to Mueller."  AFA Memo at 5.[3]  More specifically, Commerce analyzed TUNA's sales to Mueller and the corresponding costs of production, and identified as AFA the sale between TUNA and Mueller made at the greatest percentage below the cost of production. Id. at 4-5.  Commerce then evaluated whether that potential AFA rate was an outlier or aberrational, and concluded it was not.  Id. at 5.  Commerce also compared

---

[3] Commerce also assigned Ternium a total adverse facts available (AFA) rate of 48.33% for Ternium's overall failure to participate in the review.  AFA Memo at 1.

that potential AFA rate with other TUNA-Mueller sales/cost differentials and found them to be "insufficiently adverse to compel Ternium to cooperate." Id.

Having identified what it believed to be an appropriate AFA rate for Ternium's CONNUM-specific production costs, Commerce returned to Mueller's margin calculation and multiplied the AFA rate by Mueller's acquisition costs for each of Ternium's products. Id.; Decision Memorandum at 13-21. Throughout the process Commerce carefully, if not cleverly, avoided drawing an adverse inference directly against Mueller, a cooperating party. Id. at 12-13. Commerce repeatedly made clear that it was drawing an adverse inference against Ternium, not Mueller. Mueller, nevertheless, suffered adverse collateral consequences from Commerce's use of Ternium's AFA rate in Mueller's margin calculation, which increased from 4.81 percent in the preliminary results to 19.81 percent in the final.

Mueller challenges Commerce's selection of facts available for Mueller's production costs that include an AFA rate for Ternium's production costs. See Mem. in Supp. of Pls.' R. 56.2 Mot. for J. on Agency R. ("Pls.' Br."), ECF No. 38-2. Mueller argues that Commerce unreasonably applied the antidumping statute, violating the court's decision in SKF USA, Inc. v. United States, 33 CIT ___, ___, 675 F. Supp. 2d 1264, 1276 (2009) ("SKF USA"). Id. at 3-11 (Commerce's "actions and interpretation of the antidumping statute are clearly impermissible under this Court's ruling in SKF USA, Inc."). Mueller also argues in the alternative that the facts available applied by Commerce are unreasonable on this administrative record (unsupported by substantial evidence). Id. at 13-17.

## III. Discussion

### A. Commerce's Application of 19 U.S.C. § 1677e is Reasonable

This case involves 19 U.S.C. § 1677e, which governs Commerce's use of "facts available."  Section 1677e directs Commerce to use the facts otherwise available if necessary information is not available on the administrative record.   19 U.S.C. § 1677e(a).   Necessary information may not be available if, among other things, an interested party withholds information that has been requested, or fails to provide information in the form and manner requested. 19 U.S.C. § 1677e(a)(2).  For Mueller's margin calculation TUNA's production costs were available in the form and manner requested, but Ternium's were not.   Ternium's missing data implicated 1677e(a) because Ternium, an interested party and mandatory respondent, failed to provide requested information in the form and manner requested.  Ternium's lack of cooperation also implicated section 1677e(b), which permits Commerce to draw adverse inferences when selecting from among the facts available to fill an information gap.  The question here is whether section 1677e also allows Commerce to factor in AFA against a non-cooperative supplier when selecting from among the facts otherwise available to calculate a cooperating exporter's production costs.  Or stated another way, does the antidumping statute require Commerce to ignore the adverse inference against Ternium when filling the information gap for Mueller's costs of production?

Mueller and Defendant agree that the statute "is silent" for purposes of the Chevron two-step framework. Pls.' Br. at 4. Defendant-Intervenor United States Steel Corporation argues that Commerce's action is, in fact, mandated under the first prong of

Chevron. United States Steel Corp.'s Mem. in Opp'n to Pls.' Mot. for J. on the Agency R.

at 3-5, ECF No. 50.   The court, however, agrees with Mueller and Defendant that

Congress did not specifically provide the manner in which Commerce should evaluate

the costs of a cooperating exporter sourcing product from a non-cooperating producer.

Under the second prong of Chevron, Commerce's "interpretation governs" as

long as it is reasonable. United States v. Eurodif S.A., 555 U.S. 305, 316 (2009); accord

Timken Co. v. United States, 354 F.3d 1334, 1342 (Fed. Cir. 2004) ("[a]ny reasonable

construction of the statute is a permissible construction").   To determine whether

Commerce's interpretation is reasonable, the court "may look to 'the express terms of

the provisions at issue, the objectives of those provisions, and the objectives of the

antidumping scheme as a whole.'" Wheatland Tube Co. v. United States, 495 F.3d 1355,

1361 (Fed. Cir. 2007) (quoting NSK Ltd. v. United States, 26 CIT 650, 654, 217 F. Supp.

2d 1291, 1296-97 (2002)).

Commerce interpreted Section 1677e as "manifesting an intent by Congress to

provide the agency with authority to seek such information" and "a mechanism to induce

compliance if the interested party's failure to cooperate might affect the dumping margin

of another party." Decision Memorandum at 18; see also Essar Steel Ltd. v. United

States, 678 F.3d 1268, 1276 (Fed. Cir. 2012) ("Without the ability to enforce full

compliance with its questions, Commerce runs the risk of gamesmanship and lack of

finality in its investigations."). Commerce explained that it "does not have subpoena

power," and "the use of [AFA] is the only recourse available to the agency to ensure that

interested parties provide it with full and complete information." Decision Memorandum

at 18; see also Essar Steel, 678 F.3d at 1276 ("Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one."). Commerce elaborated that its "ability to use facts available provides the only incentive for an interested party to cooperate." Decision Memorandum at 18; see also Essar Steel, 678 F.3d at 1276 ("The purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation") (quoting F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000)). Commerce further explained that it "has a duty to both ensure that uncooperative parties do not benefit from their lack of cooperation and to encourage their future compliance." Decision Memorandum at 18. Commerce concluded that the statute does not require it to ignore Ternium's non-cooperation when selecting from facts available to fill the information gap for Mueller. Id.

Commerce also considered the potential effect that its statutory interpretation would have upon cooperative respondents such as Mueller. Cf. SKF, 630 F.3d at 1374-75 & n.6 (Commerce's "[u]se of adverse inferences may be unfair considering SKF has no control over its unaffiliated supplier's actions," and "Commerce must explain why" this "concern is unwarranted or is outweighed by other considerations."). Commerce reiterated that it did "not attempt to penalize Mueller," but rather, it sought "to induce compliance and to ensure that Ternium [did] not benefit from its non-compliance." Decision Memorandum at 18-19. Commerce recognized that, as "a general matter, companies that choose to do business with uncooperative parties may also be impacted." Decision Memorandum at 19. Commerce reasoned that, if it "were unable

to apply [AFA] to Ternium's exports through Mueller, Ternium would benefit from its failure to cooperate with" Commerce's "requests for information." Id. Specifically, Commerce explained that, "if we were to accept Mueller's arguments, the subject merchandise produced and exported by Ternium would be subject to a total [AFA] rate of 48.33" percent, "while the Ternium-produced merchandise exported by Mueller would be subject to the much lower weighted-average rate of Mueller, such as the rate of 4.81 [percent] from the Preliminary Results." Id. at 19-20. Commerce expressed concern that under Mueller's interpretation of the statute, "Ternium could continue to produce and sell the subject merchandise for prices less than its normal value to the U.S. market, by directing it[s] merchandise through Mueller, where it would have no obligation to ever provide cost of production information." Id. at 20.

Commerce further considered its duty to determine Mueller's margin accurately and concluded that its decision advances this interest. From a practical standpoint, without the required Ternium COP data, there is no way to know whether Mueller's home market sales of Ternium products are above or below cost, and whether they may properly be used as a basis for normal value. It is therefore difficult for Commerce, the parties, or the court to know with certainty what a truly "accurate" margin for Mueller is. Commerce explained: "Although premised on the adverse inference that Ternium's actual cost information would not be favorable—otherwise Ternium may not have elected to withhold it from the Department—the selected facts available are intended to produce an accurate, non-punitive, dumping margin for Mueller." Id. Commerce reasoned that if it "ignores the fact that Ternium chose to withhold necessary

information and fails to apply an adverse inference in the selection of facts available, the resulting dumping margin would not reflect accurately the rate at which Mueller's sales of merchandise produced by Ternium was sold at less than normal value." Id. Commerce concluded that the "[a]pplication of an adverse inference only to the missing cost of production information that Ternium has withheld is a reasonable and limited inference based on the information on the record that ensures Ternium does not benefit from its failure to cooperate and also avoids an inaccurate dumping margin for Mueller." Id.

Mueller, for its part, argues that it fully cooperated during the review and that Commerce should therefore ignore Ternium's non-cooperation to be fair when calculating Mueller's dumping margin. Pls.' Br. at 5 (quoting SKF USA, 33 CIT at ___, 675 F. Supp. 2d at 1275).

Mueller relies heavily upon the decision in SKF USA, arguing that Commerce's decision violates that precedent. Pls.' Br. at 1-10.  In SKF USA, Commerce interpreted Section 1677e as authorizing Commerce to draw an adverse inference against a cooperative exporter, SKF, based solely upon non-cooperation by SKF's unaffiliated supplier. SKF USA, 33 CIT at ___, 675 F. Supp. 2d at 1274-75.  Notably, the "unaffiliated supplier was not a party to the administrative reviews proceeding and, therefore, was not in a position to be assigned a margin reflecting an adverse inference." Id. at 1275.  Instead, Commerce imposed an AFA rate of 17.33 percent directly upon the otherwise cooperative reseller, SKF, for purposes of all sales from the non-cooperative supplier during the review.  Id. at 1267, 1275.  Commerce selected 17.33

percent because it was adverse to SKF, representing the highest dumping margin ever

calculated for SKF in any segment of the proceeding, from approximately 15 years

earlier during the third administrative review.   Id. at 1275.   The court held that

Commerce's interpretation of Section 1677e was unreasonable under the second prong

of Chevron, was "not fair" to the cooperating respondent, and violated Commerce's duty

to determine margins "accurately and according to the relevant information on the

record of the administrative review."   Id.  The court noted:

> Allowing an interested party's failure to cooperate to affect adversely the
> dumping margin of another interested party who is a party to the
> proceeding, about whom Commerce did not make a finding of non-
> cooperation, violates the Department's obligation to treat fairly every
> participant in an administrative proceeding.  As is any government agency,
> Commerce is under a duty to accord fairness to the parties that appear
> before it.  Although 19 U.S.C. § 1677e(b) does not expressly state that
> Commerce may not adversely affect a party to a proceeding based upon
> another interested party's failure to cooperate, a construction permitting
> such an absurd result makes a mockery of any notion of fairness.  In the
> specific context of the antidumping laws, a party that did not fail to meet its
> obligation to cooperate, as imposed by § 1677e(b), is entitled by § 1675(a)
> and related provisions of the antidumping law to have its margin
> determined accurately and according to the relevant information on the
> record of the administrative review.   See 19 U.S.C. § 1675(a)(1)-(2)
> (requiring generally that Commerce determine the amount of antidumping
> duty according to normal value and export price or constructed export
> price of each entry of subject merchandise); Rhone Poulenc, Inc. v. United
> States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)(stating that "the basic
> purpose of the [antidumping] statute [is] determining current margins as
> accurately as possible").

Id. at 1276.

In this case Commerce took a decidedly different approach. Commerce did not

draw an adverse inference against Mueller, did not rely upon a dumping rate previously

calculated for Mueller, or select a rate because it was adverse to Mueller.   Rather,

Commerce selected a ratio based on some of TUNA's cost data as the best available information in place of Ternium's missing cost data.  Id.  When Commerce made the judgment as to what information available on the record was best to evaluate Mueller's cost of production for Ternium products, Commerce considered the adverse inference that it had drawn against Ternium—a mandatory respondent to whom Commerce had assigned a margin reflecting an adverse inference.  Id.  Unlike SKF USA, this case involves a different interpretation of Section 1677e by Commerce, a different methodology for selecting from the facts available, and a different record.  Therefore, Mueller's argument that the facts in SKF USA are "virtually identical to the facts in this case" is not correct.  As opposed to Commerce's "unreasonable" decision-making in SKF USA, Commerce's decision-making here appears thorough, thoughtful, logical, and complete.

Commerce carefully considered the remedial statutory scheme, the intent of Congress, the potential unfairness to Mueller, and the impact of its decision on the accuracy of Mueller's dumping margin.  Decision Memorandum at 16-20.  Using its administrative expertise, Commerce reasonably concluded that all of these factors support the agency's interpretation of the antidumping statute that Congress has charged it to administer.  Id.  Commerce determined, consistent with the remedial purposes of the antidumping law, the statutory policy of encouraging interested parties to cooperate with information requests, and the obligation to calculate dumping margins as accurately as possible, that Section 1677e authorizes Commerce, in place of missing cost data needed to determine a cooperating exporter's dumping margin, to consider an

adverse inference against a non-cooperative supplier when selecting from facts otherwise available on the record.  In the court's view, that determination is reasonable and entitled to <u>Chevron</u> deference.  It therefore "governs."  <u>See</u> <u>Eurodif</u>, 555 U.S. at 316, <u>Timken</u>, 354 F.3d at 1342.

### B. Commerce Selection from Among Facts Available is Reasonable

Mueller also argues in the alternative that the facts available applied by Commerce are unreasonable on this administrative record (unsupported by substantial evidence).  Pls.'s Br. at 13-17.  This argument though is largely predicated on Mueller's argument that Commerce may not consider the adverse inferences drawn against Ternium when choosing from among the facts available to use for Mueller's production costs.  As explained above, the facts available on the administrative record for Ternium's production costs for sales made to Mueller included the AFA rate that Commerce determined for Ternium's costs of production, which Commerce derived from TUNA's production cost data and Mueller's acquisition cost data.  AFA Memo at 4.

Commerce compared "TUNA's sales to Mueller and TUNA's cost of production information for specific products."  Commerce was "able to perform a cost test on TUNA's sales to Mueller," and Commerce selected "the sales transaction between TUNA and Mueller made . . . at the greatest percentage below the cost of production."  AFA Memo at 4. This "was the same as the next two transactions with a differential between the sale price and the cost of production."  <u>Id.</u> at 5.  Commerce determined that a ratio based on TUNA's production costs for these transactions was most probative of Ternium's withheld cost data. <u>Decision Memorandum</u> at 16, 20 (Commerce "has

selected from the facts otherwise available, the best information to use in place of Temium's withheld cost data"); AFA Memo at 5 (Commerce selected the "most probative evidence" available).  There is no dispute that, like Ternium, TUNA produced the same types of products in the same country and then sold them to the same exporter (Mueller) during the same period of review.

Mueller, nevertheless, argues that production costs for the TUNA transactions that Commerce selected are not probative of <u>all</u> TUNA transactions, Pls.' Br. at 11-12, 14-16, but Defendant correctly explains that this misses the point.  Commerce selected a ratio based on <u>some</u> of the TUNA transactions because the production costs associated with them (and the accompanying **[      ]** percent differential with Mueller's acquisition price) were, according to Commerce, the best information to use in place of <u>Ternium's</u> missing cost data.  <u>Decision Memorandum</u> at 16, 20; AFA Memo at 5. Commerce reasonably declined to rely upon <u>TUNA's</u> cost data for the balance of <u>TUNA's</u> products, which had a differential of less than **[      ]** percent, because Commerce determined that they were "insufficiently adverse" to induce <u>Ternium's</u> cooperation.  AFA Memo at 5.  Commerce explained that it had assigned Ternium a total AFA rate (48.33%) during the prior review, and this had not induced Ternium to cooperate during the current review, leading Commerce to draw an adverse inference that Ternium refused to cooperate because its data would have been less favorable. AFA Memo at 5 (citing <u>Certain Circular Welded Non-Alloy Steel Pipe From Mexico</u>, 75 Fed. Reg. 20342, 20343 (Dep't of Commerce Apr. 19, 2010) (admin. review 2007-08 final results)); <u>Decision Memorandum</u> at 15-16, 18, 20 (discussing inference against

Ternium).

Mueller also argues that its acquisition costs are "certainly more probative of the issue," Pls.' Br. at 11-12, but Commerce reasonably concluded otherwise using its administrative expertise.  Preliminary Results at 78,219-20.  Congress requires that Commerce determine the costs associated with Mueller's sales of Ternium products by calculating "an amount equal to the cost of materials and fabrication or other processing of any kind employed in producing the merchandise," plus profit and selling, general, and administrative expenses.  See 19 U.S.C. § 1677b(e).  There is no dispute that Mueller does not possess all of this information because it resells rather than produces the merchandise at issue.  Decision Memorandum at 13.  Commerce also determined that Mueller's acquisition costs for products from its supplier, TUNA, did not equate to the costs of production reported by TUNA for those products.  AFA Memo at 4-6.  Commerce reasonably concluded that supplier production costs are more probative than exporter acquisition costs.  Decision Memorandum at 13; see also SKF, 630 F.3d at 1371, 1375-76 ("On the face of these provisions, Commerce can utilize unaffiliated suppliers' records for cost of production data in lieu of the exporter's acquisition cost."), on remand to, SKF USA Inc. v. United States, 35 CIT ___, 2011 WL 4889070 (Oct. 14, 2011), opinion after remand, SKF USA Inc. v. United States, 36 CIT ___, 2012 WL 2929404 (July 18, 2012)).

Finally, Mueller suggests that Commerce could have relied upon Ternium's data. Pls.' Br. at 13-14.  Ternium supplied average cost of production data relative to four of its "product families" during the administrative review, but Ternium failed to provide data

as Commerce requested on a specific, product-by-product basis.   AFA Memo at 3.

Commerce did not use average cost data for Ternium's "product families" due to

accuracy concerns.   <u>Decision Memorandum</u> at 16-17.   Commerce explained that

Ternium's average cost data limited to four product categories did not "reflect cost

differences attributable to the different physical characteristics" of the several dozen

products reviewed.   <u>Id.</u> at 17.   Therefore, Commerce reasonably concluded that

Ternium's overall cost data was not the most probative facts available in place of

Ternium's missing product-specific cost data.

### IV. Conclusion

For the foregoing reasons, Commerce's application of facts available to calculate

Mueller's costs of production is sustained.   Accordingly, it is hereby

**ORDERED** that  the <u>Final  Results</u> are  sustained with respect to Commerce's

application of facts available to calculate Mueller's costs of production; and it is further

**ORDERED** that Mueller's challenge to Commerce's practice of zeroing remains

stayed pending a decision on the issue from the U.S. Court of Appeal for the Federal

Circuit.


                                                         /s/ Leo M. Gordon
                                                        Judge Leo M. Gordon


Dated:  December 21, 2012
           New York, New York